

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00170-CR

———————————————

JUAN MANUEL HERNANDEZ AKA JUAN M. HERNANDEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court No. 1701553R

---

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

Appellant Juan Manuel Hernandez appeals from his conviction for aggravated sexual assault and sentence of forty years' confinement. Hernandez complains primarily about the sufficiency of the evidence to support his conviction. He also contends that the trial court's judgment lists the wrong Texas Penal Code provision for the offense. Because we hold that the evidence is sufficient to support his conviction and that the judgment should be modified to list the correct Penal Code section, we modify the judgment and affirm it as modified.

## I. PROCEDURAL BACKGROUND[1]

A grand jury indicted Hernandez for intentionally causing his sexual organ to contact the sexual organ of a child younger than seventeen and—with the intent to facilitate his commission of the offense—administering or providing the complainant any substance impairing her "ability to appraise the nature of the act or to resist the act." Tex. Penal Code Ann. § 22.021(a)(1)(B)(iii), (a)(2)(A)(vi). A jury found Hernandez guilty of "aggravated sexual assault of a child, as charged in the indictment." Hernandez elected to have the trial court assess his punishment, which the trial judge assessed at forty years' confinement.

---

[1]Because we recite the offense-related facts in our disposition of Hernandez's first issue, we provide only a summary of the procedural facts here.

## II. SUFFICIENCY OF THE EVIDENCE

In his first issue, Hernandez challenges the sufficiency of the evidence to prove (1) that a sexual assault occurred and (2) if a sexual assault occurred, that he was the perpetrator.

### A. STANDARD OF REVIEW

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, c, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021). Additionally, this standard applies to both direct and circumstantial evidence because circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021), *cert. denied*, 142 S. Ct. 859 (2022).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative

force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume—even if it does not affirmatively appear in the record—that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608; *see also Petetan v. State*, 622 S.W.3d 321, 337 (Tex. Crim. App. 2021).

In reviewing the sufficiency of the evidence, we should look at "events occurring before, during[,] and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Cordova v. State,* 698 S.W.2d 107, 111 (Tex.Crim.App.1985)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.*

### B. TRIAL EVIDENCE

### 1. Events Before Sexual Assault

The complainant lived in a home with her mother, two brothers, and grandmother. The complainant's mother testified that Hernandez—an in-law—along with his wife and children, began living with the complainant's family in August 2018.

4

The complainant slept on one side of the house with her mother and siblings, separated from the room where Hernandez slept by the kitchen and living room. The complainant knew Hernandez well before he began living with her family; he and his immediate family had visited for holidays and family events.

The complainant became "emotional" when testifying about Hernandez. He had made her feel uncomfortable even before the night she was sexually assaulted. The complainant testified about a time when she had been asleep on her stomach in her bed, and she awoke to someone pulling up her "short" running shorts; when she looked up, she saw Hernandez. He had touched the back of her leg, close to her "butt." Hernandez looked away and left the room. The complainant said that she remembered how his hands felt, and she would never forget that feeling; they were rough as if he did construction work on a regular basis.

Another time, when only the complainant and Hernandez were sitting in the living room, he asked her if she knew anything about a particular "porn star." Hernandez was sitting behind her with his phone, but she knew he had been watching something "inappropriate" even though she did not look at his phone.

Hernandez's sister-in-law testified that one night when she was seventeen, and up late with her infant, Hernandez repeatedly asked her to have sex with him. He followed her around the house until she went to bed. His behavior scared her. She also said he offered her alcohol and marijuana before she turned twenty-one.

## 2. Sexual Assault

On December 28, 2018,[2] the extended family gathered to celebrate a birthday party. The complainant testified that she did not remember people drinking alcohol during the party, and she would not have drunk alcohol around her family because it is disrespectful. Also, her mother and grandparents would not condone her drinking.

After it was dark, the complainant's mother went inside to go to sleep.[3] According to the complainant, almost everyone had gone inside to bed by around 1:00 a.m. By that time, only the complainant, her seventeen-year-old brother, her fifteen-year-old cousin, and Hernandez were awake. Those four were drinking alcohol Hernandez had provided. Although the four had started drinking outside so that none of the other family members would see them, they eventually moved inside. The complainant drank an entire bottle of "MD 20/20" and finished the remaining half of Hernandez's canned drink.

At some point, Hernandez offered her marijuana, and she smoked it. It was not the first time he had offered it to her. By this time, the complainant and Hernandez were outside the house; her brother and cousin were inside on the couch.

---

[2]The complainant testified that she was sixteen when the following events occurred.

[3]There were fifteen people staying in the house that night, including at least one adult male and two teenage males other than Hernandez.

The complainant started feeling "freaked out" and "scared," so she went inside to the restroom. She couldn't walk straight and was giggly.

After about fifteen to twenty minutes, the complainant came out of the restroom because her brother was looking for her. When she walked out, Hernandez was "standing there." She then went to the home's second restroom to throw up. After that, she went back to the living room couch, where she continued drinking with Hernandez, her brother, and her cousin. No one else was awake.

The complainant went back to the bathroom and threw up "[a] lot." Her brother was with her. She was afraid she was going to get into trouble for drinking because she was making so much noise. She again went back to the living room, and she sat on the couch with her brother; her cousin had gone to his room, but Hernandez was still in the living room. The complainant fell asleep with her brother next to her. At some point, she heard Hernandez tell her brother to go to bed. Her brother did not want to leave, but he did.

The complainant fell asleep again but awoke to someone pulling down her underwear and putting "rough" hands on her back. The hands felt the way she remembered Hernandez's felt when he had touched her before. But the room was dark, and she admittedly never saw the face of the person who was touching her. She was scared but she didn't say anything. According to the complainant, she felt Hernandez's hands opening her "butt" and then she felt a penis penetrating her vagina. It lasted about five or six minutes but stopped when her grandmother got up

7

to go to the restroom. She did not think her grandmother saw anything, though. The complainant felt her underwear being pulled up and a blanket being pulled over her legs.

The complainant went back to sleep[4] and did not wake up again until her mother woke her.

### 3. What Complainant's Brother Saw

The complainant's brother testified that on the night of the party, he was on the phone with his girlfriend until about 3:00 a.m. After he got off the phone, he tried to go to the bathroom, but the complainant was inside. When she came out of the bathroom, he smelled alcohol, and she was "acting weird." He went into the bathroom, and when he came out, he saw Hernandez coming inside the house with a bottle of alcohol, which Hernandez shared with him. Later, Hernandez offered him more alcohol and marijuana.

The complainant's brother confirmed that he, his cousin, the complainant, and Hernandez sat with each other on the couch until the complainant and Hernandez went outside. When Hernandez and the complainant came back inside, they all started drinking again and watched TV on their phones. When the complainant went to the bathroom to throw up, her brother went to check on her; by the time he and

---

[4]She later said she "kind of passed out."

the complainant came back to the living room, Hernandez and their cousin had left the room.

The complainant's brother confirmed that she fell asleep next to him on the couch. According to him, around 5:00 a.m., Hernandez took the complainant's grandmother to work. When Hernandez came back into the house, he told the complainant's brother to go to sleep in his own bed, but her brother was reluctant to go because he thought he would take better care of the complainant than Hernandez. After Hernandez asked at least five times, the brother moved to another couch in the room. But Hernandez persisted, so the complainant's brother finally went to his room. However, he left the door open. Hernandez closed it. The brother reopened it. Hernandez closed the door four more times, and the complainant's brother reopened it each time except the last.

Hernandez's counsel cross-examined the brother about his time frame, eliciting that nothing could have happened between 3:00 a.m. and 6:00 a.m. because he was with his sister during that time.

### 4. What Other Occupants of the Home Saw

Hernandez's wife testified that on the night of the party, she arrived home around 1:00 a.m. and saw Hernandez with her teenage son, the complainant, and the complainant's brother. Hernandez was drinking. She went inside to go to bed, and when she woke up around 5:30 a.m. or 6:00 a.m., Hernandez was not in the room with her. She walked out into the rest of the house to look for him and saw him

9

coming from the direction of the living room. He "almost looked startled," not like himself. She told him to come to bed immediately, and he complied. But Hernandez lay on the far side of the bed and did not take off his clothes, which she thought was strange.

Close to the same time, the complainant's grandmother knocked on their door so that Hernandez could take her to work.[5] Although Hernandez usually came back to bed around 8:00 a.m. or 8:30 a.m. after taking the grandmother to work, he never came back that morning, and by the time she woke up around 10:00 a.m., he had already left the home for his job.

Another family member saw Hernandez with alcohol at the party but did not see anyone else drinking. That relative and his wife went to bed around midnight. The next day, he had to clean up beer cans and "some bottles" inside and outside of the house. He also found a bag and "some kind of smoking device" that smelled like marijuana.

### 5. The Next Morning and Day (or Days) After

When the complainant's mother awoke the morning after the party, the complainant was asleep on the couch, which was unusual. She had a blanket over her. Her mother could smell alcohol upon walking into the living room. She shook the

---

[5]Hernandez's wife's testimony is somewhat confusing as to the timing of events. Although she testified that she woke up and found Hernandez out of bed around 5:30 a.m. to 6:00 a.m., she also testified that her mother knocked on their door around 6:00 a.m. or 6:30 a.m.

complainant, raised her voice, and told her to go take a shower. The complainant complied. The complainant's mother was angry with her daughter for drinking.

Afterward, Hernandez came into the kitchen, got a Gatorade from the refrigerator, and said he was taking it to the complainant. The complainant's mother admonished him that he "better not have given alcohol to" the complainant, and he denied doing so.

During the complainant's ten-minute[6] shower, the complainant's mother could hear her crying loudly. The complainant explained that, while showering, she felt disgusted and upset because she was remembering what had happened and she could feel sticky fluid on her backside. She "scrubb[ed]" her body with a loofah.

When the complainant got out of the shower, her mother thought she looked "different" and upset, but the complainant denied that anything was wrong, and she asked her mother to take her to her friend's house. The complainant never expressly told her mother what had happened. The complainant said at trial that she did not want her mother to know.

Either that same day or the day after,[7] the complainant was at a friend's house and became shy when trying on a dress. After the friend's mother assured the

---

[6]The complainant testified that she showered for about an hour.

[7]The complainant's mother and the complainant's friend's mother both testified that the complainant had come over on the day after the party. But the complainant testified that she went to a different friend's house the day after the party and then went to visit this friend on the second day after the party.

complainant that the dress was appropriate for church, the complainant began to cry. After the girls left the room, the complainant's friend came back to her mother and told her something was wrong with the complainant. Although the complainant refused to tell her friend's mother why she was upset, she eventually wrote on a piece of paper that she had been raped, and she identified her familial relationship to the man she said had raped her. The complainant said the sexual assault had happened around 4:00 a.m. The complainant also told her friend's mother that the man had given her alcohol and drugs, but she denied knowing the type of drug. The friend's mother called the complainant's mother, who came over to the friend's house. Together, the two adults took the complainant to the hospital and called the police.

### 6. Forensic Evidence

A sexual assault nurse examiner (SANE) testified that she examined the complainant on December 30, 2018 at 11:15 p.m., the day after the sexual assault. The complainant identified Hernandez as the perpetrator and told the SANE that Hernandez had given her liquor and beer, that she had been drunk, that she had thrown up and then passed out on the couch, that she had felt Hernandez pulling off her clothes, and that she had felt him sticking his penis into her vagina. The complainant told the SANE that Hernandez had not used a condom. The complainant reported to the SANE that she had lost consciousness and that she estimated the time of the sexual assault as 4:00 a.m. Therefore, the SANE concluded that her examination occurred about forty-eight hours after the sexual assault.

The SANE performed a physical examination of the complainant and took vaginal swabs. No male DNA was found on the swabs. The SANE explained that many factors can affect whether DNA is collectible after a sexual assault, depending on how much time had passed and whether the person had showered or cleaned the contacted area.[8] She said that it is unusual for her to examine someone who had not showered or performed other hygiene activities after a sexual assault.

In addition to being examined by the SANE, the complainant was interviewed about the sexual assault. The forensic interviewer testified at trial, outlining the interview process in general. She explained how sexual predators often groom children by providing them alcohol and marijuana. She also explained that, to a child, timelines of what happened are often difficult to recall because a child might remember what happened but not in the exact sequence. Additionally, ingesting alcohol and drugs can affect a person's recall of an event. She explained that children who are coached often don't remember sensory and peripheral details[9] while children who are telling the truth about a sexual assault do.

---

[8]The forensic biologist who examined the DNA swabs also testified that showering, bathing, and the passage of time all could affect the presence of DNA.

[9]Sensory details are "those details that are dealing with [the] five senses," and peripheral details are "surrounding details to an event."

## C. ANALYSIS

Based on the absence of DNA on the swab samples taken from the complainant—and the complainant's intoxication and inability to directly identify him as the perpetrator—Hernandez argues that the evidence is insufficient to support his conviction. But reviewing the record in its entirety, as we must, we conclude that the "cumulative force of all the incriminating circumstances" supports Hernandez's conviction. *See Hooper*, 214 S.W.3d at 13. The State offered testimony explaining why DNA might not be found after a sexual assault and why a victim might not remember all of the details about an assault. In addition, the jury was entitled to resolve any conflicts in the testimony from the various witnesses about the timing of events; we must defer to the jury's resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793. This is not a case in which no rational juror could have found the essential elements of the crime beyond a reasonable doubt. *See id.* at 319, 99 S. Ct. at 2789. Accordingly, we overrule Hernandez's first issue.

## III. JUDGMENT MODIFICATION

In his second issue, Hernandez contends that the trial court's judgment should be modified to recite the correct Penal Code provision under which he was convicted. The State concedes that he is correct, and we agree. Hernandez was charged with, and convicted under, Penal Code Section 22.021(a)(1)(B)(iii), (a)(2)(A)(vi) (describing sexual assault of a person younger than seventeen while facilitating the offense by providing substance capable of impairing victim's ability to resist or appraise nature of

14

the act).  But the judgment recites that Hernandez was convicted under Penal Code Section 22.021(a)(2)(B).[10]  Because the judgment recites an incorrect Penal Code provision, we sustain Hernandez's second issue.

## IV.  CONCLUSION

Having sustained Hernandez's second issue, we modify the judgment to recite that Hernandez was convicted under Texas Penal Code Section 22.021(a)(1)(B)(iii), (a)(2)(A)(vi).  But having overruled his first issue, we affirm the judgment as modified.

/s/ Brian Walker

Brian Walker
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 31, 2022

---

[10]Subsection (a)(2)(B) applies when the victim in younger than fourteen.  Tex. Penal Code Ann. § 22.021(a)(2)(B).